UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
THOMAS CURRAO,

                  Petitioner,                           REPORT AND
                                                    RECOMMENDATION
       -against-                              04-CV-3346 (CBA) (RML)

RONALD MOSCICKI, Superintendent,
Lakeview Correctional Facility, and
ELIOT SPITZER, New York State
Attorney General,

                  Respondents.
-----------------------------------------------------X

LEVY, United States Magistrate Judge:

        Petitioner Thomas Currao ("petitioner" or "Currao") brings this action pursuant to 28

U.S.C. ' 2254 for a writ of habeas corpus. By order dated August 16, 2004, the Honorable Carol

Bagley Amon, United States District Judge, referred this matter to me for a Report and

Recommendation. The issues raised in the petition were fully briefed as of December 2004. I held oral

argument on January 6, 2005 and conducted a hearing on April 27, 2005. Post-hearing submissions

have been received. For the reasons stated below, I respectfully recommend that the petition be

denied.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

        On June 15, 1996, petitioner and co-defendant Vernon Foye were charged with

second-degree assault (N.Y. Penal Law § 120.05(1)) for the beating of Peter Badalucco in an elevator

at 175 Ardsley Loop, Starrett City, Brooklyn. That same day, Badalucco was taken to Brookdale

Hospital. The second-degree assault charges were dismissed without prejudice on July 15, 1996.

(See Affirmation of Ellen Dille, Esq. in Support of § 440.10(1)(h) Motion, dated Dec. 11, 2002 ("Dille

Aff."), ¶ 3.)  Badalucco remained hospitalized and ultimately died on August 8, 1996.  (See id.;

People's Statement of Facts and Memorandum of Law in Opposition to Defendant's Motion to Vacate

Judgment, dated Mar. 31, 2003 ("People's Mem."), at 2-3.)  Following Badalucco's death, petitioner

and Foye were indicted for murder.  (See Indictment No. 8377/96.)  By superseding indictment, No.

851/98, petitioner and Foye were charged with intentional and depraved indifference murder, first-

degree manslaughter, second-degree manslaughter, criminally negligent homicide, and first- and

second-degree assault.  (Dille Aff. ¶ 3.)   In February 1998, Foye -- who at that point had spent

sixteen months in jail as result of the pending charges -- entered into a cooperation agreement, pursuant

to which he was permitted to plead guilty to second-degree assault and receive a promised sentence of

six months imprisonment and four and one-half years' probation.  (See Dille Aff. ¶ 5; Affidavit of Diane

R. Eisner, Esq., sworn to Dec. 8, 2004 ("Eisner Aff."), ¶ 13.)

Petitioner was initially represented by attorney Jonathan E. Weinrich, who was relieved

on April 24, 1998 by petitioner's *pro se* motion.  At the conclusion of the suppression hearing on that

date, the court appointed Alan Stutman as counsel.  (Suppression Hearing Minutes, dated Apr. 24,

1998 (Ex. H), at 2, 44.)  At a later Sandoval Hearing, Mr. Stutman obtained a ruling precluding the

State from inquiring about certain domestic violence incidents.  (Transcript of Voir Dire, dated July 27-

29, 1998, at 7.)

A.  The Trial

Twelve witnesses testified at the trial, which commenced on July 29, 1998: Vernon

Foye, Natalia Rapaport, and Andre Eugene; Starrett City Peace Officers Marcellino Rivera, Edmond

Flood, and Willie Little; New York City Police Sergeant Stephen Maher, New York City Police

Detective Thomas Maher, the victim's relatives Richard Badalucco and Andrew Badalucco; Dr.

Joaquin Gutierrez, and Dr. Miran W. Salgado. (See Trial Transcript, dated July 29-31, 1998 ("Tr.").)

Natalia Rapaport, who was 19 years old in June 1996, testified that she had been

dating Currao for three weeks prior to the incident. (Tr. at 25-26.) She stated that she, Currao and

Foye had been at a restaurant in Brighton Beach drinking immediately prior to returning to the building

in Starrett City where she lived and where Currao was staying with a friend named Andre Eugene. (Id.

at 30.) She further stated that, as the three entered the elevator, Currao and Foye were having an

argument about money. (Id.) Rapaport did not notice Badalucco in the elevator during the ascent.

(Id. at 49-50). After she exited the elevator on the sixth floor, she noticed that Currao and Foye had

not followed her. She testified that she sat on the floor in the hallway while she waited for them. (Id.)

She then heard "muffled sounds" and returned to the elevator, where she saw Currao kicking

Badalucco, who was lying face-up on the floor of the elevator with blood on his head and torso. (Id. at

31.) She said that Badalucco did not speak or attempt to defend himself in any way and that, when

Currao finished kicking Badalucco, "he pushed [Badalucco's] legs inside the elevator because the way

that the victim was lying, his legs were outside of the elevator a little bit, and the elevator door couldn't

close. So he pushed his legs inside the elevator and let the elevator door close." (Id. at 32-33.)

Officer Rivera testified that on June 15, 1996 he was called to report to 175 Ardsley

Loop. (Id. at 82.) Upon his arrival, he pressed the button for the elevator. (Id. at 83.) Rivera stated

that when the elevator doors opened, he found Badalucco lying face-up on the floor with "blood

coming out from the back of his head." (Id. at 84.) He said he attempted to speak with Badalucco but

"couldn't get a response because he was moaning and his eyes were rolled back." (Id. at 86.) He

instructed his partner, Officer Flood, to call for an ambulance. (Id. at 84.) After the EMTs arrived and

removed Badalucco from the scene, Rivera cleaned up what he described as "a lot of blood" in the

elevator. (Id. at 88-89.) Rivera testified that when he later returned to the Starrett City security office,

he saw Currao, whom he said he had known from the neighborhood for years, in a holding cell "acting

in an erratic state . . . yelling [and] screaming . . . ." (Id. at 92-93.) He also stated that the wall of the

cell, which had been intact earlier in the evening, "had a humongous hole in the side." (Id. at 93.) On

cross examination, Rivera testified that when he entered the elevator he discovered, in addition to the

victim's property (which included a motorcycle helmet), a watch belonging to Foye. (Id. at 106-07.)

Rivera said that Foye later claimed the watch, which had blood on it. (Id. at 107.)

      Officer Flood likewise testified that on June 15, 1996 he was called to report to 175

Ardsley Loop. (Id. at 113-14.) He said that he and Officer Rivera waited for the elevator and, when it

arrived, he saw a man lying on the floor bleeding from the back of the head and on the side of his face.

(Id. at 114-15.) He then radioed for an ambulance. (Id. at 115.) When he later returned to the

security office, he saw Currao in a holding cell "kicking in the side of the wall." (Id. at 119.)

      Lieutenant Little also testified that he was called to report to 175 Ardsley Loop on June

15, 1996. (Id. at 132.) He stated that when he arrived at the building, Officers Rivera and Flood

greeted him and directed him to an individual lying face-up on the floor of the elevator "unconscious" or

"semi-conscious." (Id. at 132-33.) He said that he took the man's pulse and confirmed that he was

"still alive." (Id. at 134.)

      All three peace officers – Rivera, Flood, and Little – testified that Foye emerged from

a door in the lobby shortly after the elevator arrived, and that upon seeing Badalucco, Foye said, in essence, "I didn't do all that . . . . I only hit him once." (Id. at 87.  See also id. at 116, 135, 137.) Little testified that he escorted Foye to the security office, where he questioned Foye about the assault. (Id. at 137.)  He then directed other officers to search for Currao.  (Id. at 138.)  When Currao was brought to the office, he was handcuffed and placed in a holding cell, where according to Little, he "started banging around," "was going crazy," and "kicked a hole in the wall." (Id. at 140, 166.)  Little said that when Currao arrived, Currao had what looked like a blood stain on his calf and he appeared intoxicated.  (Id. at 146, 163.)

New York City Police Sergeant Stephen Maher testified that he was called to respond to Starrett City headquarters on June 15, 1996 sometime after 7:00 p.m.  (Id. at 360-61.)  He stated that he saw both Foye and Currao there, and he noticed that Currao had bruises and bloodstains about his body and "blood spattered about the footwear." (Id. at 363-64.)

Richard Badalucco, Peter Badalucco's uncle, testified that he lived approximately a mile and a half away from Starrett City in Brooklyn.  (Id. at 186-87.)  He stated that on June 15, 1996 at around 5:00 p.m. his nephew visited on his motorcycle and stayed for approximately one hour, during which the two shared milk and cookies.  (Id. at 187-88.)  Later that evening, he received a telephone call from Peter's mother telling him that Peter was in the hospital.  He stated that he went directly to the hospital, where he found Peter unresponsive.  (Id. at 190.)  Over the course of the following seven weeks, Richard Badalucco visited Peter in the hospital every day; he testified that Peter was never able to speak or sit up on his own, but that Peter did occasionally squeeze his finger.  (Id. at 190-91.)

Andrew Badalucco, Peter Badalucco's brother, testified that he visited Peter in the hospital the day after the assault.  (Id. at 179-80.)  He said that his brother was unconscious and unresponsive and that "[t]he right side of his face was all distorted and swollen [and] he had a gash going down the side of his temple. . . ."  (Id. at 180-81.)  Andrew testified that he visited Peter in the hospital three to four times a week for approximately an hour each time, and that he never saw his brother speak, sit up on his own, or get out of bed.  (Id. at 182.)

Vernon Foye testified that in June 1996 he was living "[o]ff and on" with his mother in Starrett City and working for Currao as a stock salesman.  (Id. at 193.)  He stated that on June 15, 1996 at approximately 7:00 p.m., he, Currao and Rapaport entered an elevator together at 175 Ardsley Loop.  (Id. at 196-97.)  Also in the elevator was Peter Badalucco, whom Foye did not know. (Id. at 197.)  Foye stated that he and Currao, whom he described as "glassy-eyed" and "agitated," were arguing about money that Foye claimed Currao owed him.  (Id. at 197, 260.)  He testified that, as the elevator ascended, the following ensued:

> Well, we were arguing over our money, Natalia said to me, "Well, I
> think," to Tommy [Currao], "I think you should pay him," and Tommy
> told her to mind her business, and so on. . . . [Then] Mr. Peter
> Badalucco said that "You should pay the man," and then Tommy said,
> "Mind your business," and so on.  Then he [Currao] said to me, "Hit
> him," so I hit him.  He [Badalucco] dropped to one knee, he got up, the
> elevator opened up, I got off, Natalia got off. . . . After Natalia and I
> got off the elevator, Mr Currao jumped from one side of the elevator to
> the other side and started to pound on this gentleman; after, the
> gentleman hit the floor. . . . [Currao] started punching [Badalucco] in
> the head, after he punched him in the head, the gentleman was lying on
> the floor, Mr. Currao proceeded to stomp on his head, kick him in the
> chest, and so on.  After that took place, he picked the gentleman – he
> was standing over the gentleman, the gentleman was between his legs,
> he picked the gentleman up, threw him to one side of the elevator; and

that's when I said, it's time to leave. I don't want to see nothing.
That's when I left.

(Id. at 197-200.)

Foye said that, shortly thereafter, he went downstairs to the lobby, where he saw "Mr. Badalucco's feet hanging out of the elevator" and was questioned by Starrett City security officers. (Id. at 205.) He later went to the Starrett City security office, where he made a statement and, approximately a half hour later, saw security officers bring in Currao, who "was yelling, arguing, screaming. . . ." (Id. at 206-07.) He testified that he was arrested that night and released on his own recognizance, but that when he learned in November 1996 that the police were looking for him, he called his lawyer and turned himself in. (Id. at 210-11.) He then described his cooperation agreement with the District Attorney's office, in which he agreed to plead guilty to second degree assault and was promised a sentence of six and a half months incarceration and four and a half years probation in exchange for his cooperation. (Id. at 213-14.)

Dr. Gutierrez, a New York City Medical Examiner, testified that he performed an autopsy on Peter Badalucco on August 9, 1996. (Id. at 296, 299.) He described Badalucco's body as "emaciated" and noted evidence of chronic intravenous drug use and encephalopathy due to H.I.V., as well as a "subdural hemorrhage or hematoma on both sides of the brain," which he testified occurs when "the blood vessels connecting the [dura] are ruptured due to a blunt impact to the head." (Id. at 301, 304-05.) He also testified that he found evidence of "diffused axonal injury," and that he had reached the conclusion, to a reasonable degree of scientific certainty, that "the cause of death was the blunt impact injury to the head with complications[,] [t]he complications being the bronchial

pneumonia," which was located in both lungs and "was the result of the deceased not being able to put out secretions" because he was unconscious. (Id. at 301, 303.) He stated that Badalucco had been unconscious "since the time of trauma to the time of death" and he asserted that a person cannot suffer diffused axonal injury or a subdural hematoma on both sides of the brain as a result of AIDS, but only from a blunt head trauma. (Id. at 304.) He concluded that Badalucco did not die of AIDS or HIV, or from chronic drug use, but from blunt impact head trauma. (Id. at 304-05.)

Dr. Salgado, an attending neurologist at Brookdale Hospital, testified that he examined Peter Badalucco on June 18, 1996 and found that he exhibited irreversible, severe diffused axonal injury, which was the result of head trauma. (Id. at 335-37, 340.) He stated that Badalucco was unconscious and "unresponsive to any kind of verbal communication[,] which he had been right through his admission," and that he was "responsive to painful stimuli," "had roving eye movements" and was "spastic," meaning stiff in his limbs. (Id. at 334-35, 352.) Dr. Salgado noted that Badalucco had AIDS, but he concluded that Badalucco's condition was not caused by AIDS and would have been no different if Badalucco had never contracted AIDS. (Id. at 340-41.) Although he did not specifically diagnose Badalucco as being in a persistent vegetative state on June 18, 1996, Dr. Salgado explained that there is such a condition as "wakefulness without awareness," in which a patient whose brain has been severely damaged but whose brain stem is preserved can "look awake" but "they're not aware and they don't respond . . . in a purposeful manner." (Id. at 355-56.)

Finally, Detective Thomas Maher (who is no relation to Sergeant Stephen Maher) testified regarding his involvement in the Badalucco investigation. He stated that he was assigned to the case after Badalucco's death, when it was deemed a homicide, and he described his interviews with the

witnesses and officers who were present on the day of the assault. (<u>Id.</u> at 371-73.) He then described

his efforts to locate Currao, whom he and members of the Los Angeles Police Department eventually

apprehended in North Hollywood, California living under an assumed name. (<u>Id.</u> at 391-92.)

Petitioner was acquitted of both the depraved indifference and intentional murder

charges, but was convicted of first-degree manslaughter (N.Y. Penal Law § 125.20[1]). (Tr. at 560.)

On September 15, 1998, he was sentenced to an indeterminate term of imprisonment of twelve and

one-half to twenty-five years. (Transcript of Sentencing, dated Sept. 15, 1998, at 17.)

B. <u>Post-Trial Proceedings</u>

On April 16, 2002, petitioner filed a request with the Appellate Division, Second

Department ("Appellate Division") for abeyance of his direct appeal pending resolution of a N.Y.

C.P.L. § 440.10 motion he intended to file on the ground of ineffective assistance of trial counsel. (<u>See</u>

Affirmation of Ellen Dille in support of Petitioner's Motion to Defer Perfection of His Direct Appeal,

dated Apr. 16, 2002.) On May 28, 2002, the Appellate Division denied petitioner's motion and

directed petitioner to file his appeal expeditiously. (<u>See</u> Decision and Order on Motion, dated May 28,

2002.)

Petitioner perfected his direct appeal in November 2002. The brief contained three

arguments: (1) that the prosecution failed to prove beyond a reasonable doubt that injuries the decedent

sustained in the assault caused his death, (2) that petitioner was denied the effective assistance of trial

counsel, and (3) that his sentence was excessive. By decision and order dated April 28, 2003, the

Appellate Division affirmed petitioner's conviction and sentence, holding, *inter alia*, that petitioner had

received meaningful representation at "all stages of the proceedings." <u>People v. Currao</u>, 757 N.Y.S.2d

877 (2d Dep't 2003).  By order dated June 26, 2003, the New York Court of Appeals denied

petitioner's request for leave to appeal.  People v. Currao, 795 N.E.2d 43  (N.Y. 2003).

On or about December 11, 2002, during the pendency of his direct appeal, petitioner

filed a motion to vacate the September 15, 1998 judgment, pursuant to N.Y. C.P.L. § 440.10(1)(h).

Petitioner argued that the judgment was obtained in violation of his rights under the state and federal

constitutions, in that he was denied effective assistance of trial counsel.  (See Notice of Motion, dated

Dec. 11, 2002.)  Specifically, petitioner argued that his trial counsel was ineffective for failing to consult

an expert to interpret Badalucco's medical records and to fully contest the cause of death.  Annexed to

the motion was an affidavit from Dr. Peter E. Fisher, Chief of the Autopsy Service and Director of the

Division of Medical Pathology at New York Presbyterian Hospital, Columbia-Presbyterian Medical

Center, whom petitioner's appellate counsel had consulted.  (See Affidavit of Dr. Peter E. Fisher,

sworn to Dec. 6, 2002 ("Fisher Aff."), Petitioner's Appendix at 53-60.)  In his affidavit, Dr. Fisher

stated that he had been provided with Badalucco's medical records and autopsy report and with the

grand jury and trial testimony of the State's medical experts.  (Id. ¶ 2.)  He opined that Badalucco died

from the withdrawal of supportive care for pneumonia that was a complication of AIDS.  (Id. ¶ 3.)  He

stated that, in his opinion, the pneumonia was "improving in the period preceding his death," that

Badalucco did not die as a result of diffuse axonal injury due to blunt trauma to the head, and that "had

the patient continued to receive supportive medical care, his recovery would have continued, with

AIDS being the only limitation on his long-term prognosis."  (Id.)  Dr. Fisher referred to entries in the

hospital records indicating the hospital staff's final decision not to reintubate Badalucco after the patient

had removed a tube that assisted his breathing, which he had done a number of times during his

hospitalization.  (Id. ¶¶ 6, 18.)  Dr. Fisher also referred to entries that he asserted showed Badalucco to

have been "awake and alert" on some occasions.  (Id. ¶¶ 3, 4.)  Dr. Fisher concluded that the medical

records did not demonstrate that the patient sustained severe head trauma in an assault, that "the sole

and direct cause of the patient's death was the withdrawal of supportive medical care," and that the

brain pathology seen in the autopsy was consistent with AIDS-related disease.  (Id. ¶¶ 7, 10, 20.)

In her affirmation in support of petitioner's CPL § 440.10 motion, appellate counsel

described a conversation she claims to have had with trial counsel, in which she asked him if he had

consulted a medical expert on causation and he responded that he had not.  When appellate counsel

asked trial counsel why he had not contacted an expert, trial counsel said, "If you have to do a 440, go

for it."  Appellate counsel stated that when she later asked trial counsel to sign an affidavit admitting that

he had provided ineffective assistance, he declined.  (See Dille Aff. ¶ 128.)

On June 24, 2003, the Supreme Court, Kings County, denied petitioner's claim of

ineffective assistance of trial counsel, holding that the Appellate Division had already considered and

rejected the issue on the merits.  (See Decision and Order, dated June 24, 2003, at 2-4.)  The court

further stated that, were it to decide the issue on the merits, it would find that petitioner's trial counsel

had acted competently pursuant to the standard enunciated in People v. Satterfield, 66 N.Y.2d 796,

799 (1985).  (Id. at 3.)  The court noted that the jury did not convict petitioner of second-degree

murder but rather the lesser charge of first-degree manslaughter.  (Id.)

Petitioner sought permission to appeal the denial of his C.P.L. § 440.10 motion.  (See Petitioner's

Memorandum of Law in Support of His Petition for Writ of Habeas Corpus, dated Aug. 5, 2004 ("Pet.

Mem."), at 3, 52.)  On March 10, 2004, the Appellate Division summarily denied petitioner's request.

(Id.)

Petitioner filed the instant habeas corpus petition on August 5, 2004. In his petition, Currao contends that he was deprived of effective assistance of trial counsel due to counsel's failure to consult a medical expert in support of his challenge to causation. (See Petition at 2; Pet. Mem. at 53.) I conducted a hearing on April 27, 2005, at which attorney Alan Stutman testified. (See Transcript of Hearing, dated Apr. 27, 2005 ("Hearing Tr.").)

## DISCUSSION

A. Jurisdictional Requirements

A petitioner seeking habeas corpus review must satisfy certain jurisdictional requirements. The first line of inquiry is whether the petition is barred by the applicable statute of limitations. The Antiterrorism and Effective Death Penalty Act of 1996 (the "Act"), Pub. L. No. 104-32, tit. I, § 104 (1996), imposes a one-year statute of limitations on habeas corpus petitions. To determine whether the petition is timely under the provisions of the Act, the court must calculate one year from the latest of the dates provided for in 28 U.S.C. § 2244(d). Specifically, § 2244(d)(1)(A) provides that the one-year limitation period shall run from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."

As mentioned above, petitioner appealed the judgment of conviction against him to the Appellate Division, which denied his claim on June 24, 2003. The New York Court of Appeals then denied leave to appeal on June 26, 2003. The one-year time limit thus began to accrue on September 26, 2003, at the conclusion of the ninety days during which petitioner could have sought certiorari to the United States Supreme Court (see Rule 13.1 of the Rules of the Supreme Court of the United States

("Unless otherwise provided by law, a petition for a writ of certiorari to review a judgment in any case, civil or criminal, entered by a state court of last resort … is timely when it is filed with the Clerk of this Court within 90 days after entry of the judgment"); Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001) ("The circuits that have addressed this precise issue -- as well as several district courts in this circuit -- have held that 'direct review,' as used in Section 2244(d)(1)(A), includes direct review by the United States Supreme Court via writ of certiorari, and that the limitations period for state prisoners therefore begins to run only after the denial of certiorari or the expiration of time for seeking certiorari.").  Therefore, petitioner's filing of this writ of habeas corpus on August 5, 2004 falls within the statute of limitations, which would have ended September 26, 2004.

A petitioner seeking to invoke habeas corpus review must also be in custody pursuant to the judgment of the state court.  28 U.S.C. § 2253(a).  The "custody" requirement is met if the petitioner is presently serving a sentence.  Hensley v. Municipal Court, 411 U.S. 345, 350-53 (1973).  Petitioner is currently serving his prison sentence (Pet. Mem. at 1; Eisner Aff. ¶ 41) and thus meets the "custody" requirement.

### B.  Exhaustion of State Court Remedies and Procedural Bar

Prior to addressing the merits of a habeas corpus petition, the court must also determine whether the petitioner has exhausted his state remedies.  See Picard v. Connor, 404 U.S. 270, 274 (1971).  This requirement, which is codified at 28 U.S.C. §§ 2254(b) and (c), is based on considerations of comity between federal and state courts and is meant to ensure that the state courts have an opportunity to consider and correct any violation of their prisoners' federal constitutional rights.  See Picard, 404 U.S. at 275; Daye v. Attorney General of New York, 696 F.2d 186, 191 (2d Cir.

1982) (en banc); <u>Coleman v. Greiner</u>, No. 97-CV-2409, 1999 WL 320812, at *2 (E.D.N.Y. May

19, 1999). To satisfy this exhaustion requirement, the petitioner must fairly have presented at each

available level of the state courts the same constitutional claims raised in his or her petition to the federal

court. <u>See</u> <u>Picard</u>, 404 U.S. at 275-76; <u>Klein v. Harris</u>, 667 F.2d 274, 282-83 (2d Cir. 1981);

<u>Coleman</u>, 1999 WL 320812, at *2.

   Petitioner timely raised his claim of ineffective assistance of trial counsel at each level of

his appeal. <u>People v. Currao</u>, 757 N.Y.S.2d 877 (2d Dep't 2003); <u>People v. Currao</u>, 795 N.E.2d 43

(N.Y. 2003). Therefore, the claim has been properly exhausted and is not procedurally barred.

   Respondent argues that this court may not consider Dr. Fisher's affidavit or references

in Ms. Dille's affirmation to post-trial conversations with trial counsel. According to respondent, those

supplemental statements, submitted in support of petitioner's C.P.L. § 440.10 motion, are procedurally

barred on habeas review because the state court denied the motion based on a procedural bar. (<u>See</u>

Respondent's Memorandum of Law, dated Dec. 9, 2004 ("Resp't Mem."), at 22.)

   Under the procedural default doctrine, federal habeas courts generally may not review

a state court's denial of a state prisoner's federal constitutional claim if the state court's decision rested

on an independent and adequate state procedural default. <u>Coleman v. Thompson</u>, 501 U.S. 722, 729

(1991) ("This court will not review a question of federal law decided by a state court if the decision of

that court rests on a state law ground that is independent of the federal question and adequate to

support the judgment"); <u>Epps v. Commissioner of Correctional Servs.</u>, 13 F.3d 615, 617 (2d Cir.

1994) (no federal habeas review of decisions based on independent and adequate state grounds

"[b]ecause of comity and federalism concerns and the requirement that States have the first opportunity

-14-

to correct their own mistakes"). Under this doctrine, a procedural default of a claim in state court cannot bar a federal court from reviewing the claim on a petition for habeas corpus "unless the last state court rendering judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 262-63 (1989) (quoting Caldwell v. Mississippi, 472 U.S. 320, 327 (1985)).

Here, the state court denied Currao's motion on the ground that his ineffective assistance claim had been reviewed on the merits and rejected by the Appellate Division on direct appeal. (See Decision and Order, dated June 24, 2003, at 2-3.) That decision was apparently based on N.Y. Crim. Proc. L. § 440.10(2)(a) (procedural bar where appeal court previously determined claim on the merits)). As one court recently explained, "[a] dismissal under § 440.10(2)(a) is not based on any procedural *default*." Brown v. Senkowski, No. 97 Civ. 3862, 97 Civ. 4415, 2004 WL 2979792, at *2 (S.D.N.Y. Dec. 14, 2004) (emphasis in original) (citing Douglas v. Hollins, No. 00-7928, 2004 WL 187130, at *6 n. 5 (S.D.N.Y. Jan. 29, 2004)). "'To the contrary, it is premised on a prior decision' on the merits . . . such that it does 'not constitute a state law ground for dismissal that is independent of the merits of petitioner's federal claims.'" Id. (quoting Anderson v. Scully, No. 90-171, 1991 WL 156234, at *3 (S.D.N.Y. Aug. 7, 1991)).

In sum, the state court's apparent reliance on C.P.L. § 440.10(2)(a) does not constitute a clear and express statement of an independent and adequate ground sufficient to preclude habeas review of any portion of petitioner's ineffective assistance claim. Thus, the supplemental

submissions are not procedurally barred, and there is no impediment to this court considering them.[1]

    C.  <u>Ineffective Assistance of Counsel</u>

        Petitioner argues that he was denied his Sixth Amendment right to the effective assistance of trial counsel.  It is well-established that "[t]o prove a claim of ineffective assistance of counsel, petitioner must demonstrate: (1) that his counsel's performance was constitutionally deficient; and (2) that the deficient performance prejudiced the defense." <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>see</u> <u>also</u> <u>Panuccio v. Kelly</u>, 927 F.2d 106, 108 (2d Cir. 1991).  With regard to the first prong, the Supreme Court has stated that constitutionally deficient performance "requires [a] showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." <u>Strickland</u>, 466 U.S. at 687; <u>see</u> <u>also</u> <u>Sepulveda v. United States</u>, No. 95-CV-2569, 1998 WL 355182, at *2 (E.D.N.Y. June 29, 1998) ("Although the Supreme Court has not established specific guidelines for evaluating the reasonableness of counsel's actions, courts should apply a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional [assistance]'") (quoting <u>Strickland</u>, 466 U.S. at 689); <u>Cotto v. Lord</u>, No. 99 Civ. 4874, 2001 WL 21246, at *8 (S.D.N.Y. Jan. 9, 2001) ("A petitioner cannot meet the first prong of the Strickland test merely by showing that [his or] her counsel employed a poor strategy or made a wrong decision."), <u>aff'd</u>, 2001 WL 1412350 (2d Cir. Nov. 8, 2001).  As a general matter, "strategic

---

[1] Nor can any part of petitioner's ineffective assistance claim be deemed unexhausted.  To the extent a claim is based on matters dehors the record, the appropriate vehicle for raising them is a motion to vacate the judgment pursuant to C.P.L. § 440.10.   Petitioner did bring the appropriate motion, and it was denied.  As explained, petitioner sought permission to appeal the denial of his C.P.L. § 440.10 motion, and the Appellate Division summarily denied the request.  The matter is therefore exhausted.

choices made after thorough investigation of law and fact relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 690-91.

Under the second prong, petitioner "must establish that there is 'a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.'" Sepulveda, 1998 WL 355182, at *2 (quoting Strickland, 466 U.S. at 694). Put another way, the "question is whether there is a reasonable probability that, absent the errors, the fact finder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695.

At the core of petitioner's ineffective assistance claim is his causation defense. As explained, Peter Badalucco died almost eight weeks after his admission to Brookdale Hospital. In addition, it is undisputed that Badalucco had AIDS, and that on July 24, 1996, approximately five weeks into his hospitalization, Badalucco's mother signed a Do Not Resuscitate Order ("DNR") authorizing his physicians to withhold cardiopulmonary resuscitation in the event his heart were to stop beating or he were to stop breathing. (Resp't Ex. B at 2-7.) According to petitioner, trial counsel made serious errors by failing to consult a medical expert and failing adequately to familiarize himself with Badalucco's medical records prior to trial. (Pet. Mem. at 69, 70.) Petitioner argues that, had his trial counsel consulted a medical expert, he could have focused the jury's attention on certain inconsistencies in Badalucco's hospital records – which defense counsel himself introduced into

evidence – and used them to impeach the prosecution's medical witnesses and cast reasonable doubt on the government's theory of Badalucco's cause of death.

Specifically, petitioner points to entries in the hospital records that defense counsel did not highlight at trial and that purportedly undermine the contention that Badalucco's death was caused by the injuries he sustained in the June 15, 1996 assault. For example, petitioner cites to page 3 of the DNR, where Dr. Tooraj Zahedi, the attending physician, checked off three out of four reasons for suitability for a DNR, leaving unchecked "the patient is permanently unconscious." (Resp't Ex. B. at 4.)[2] Moreover, according to petitioner, Badalucco's initial CT scan showed no acute swelling or bleeding on the brain and no indication of a depressed skull fracture, although subsequent CT scans showed subdural collections. (See Fisher Aff. ¶ 7). Petitioner contends that the later appearance of subdural collections "suggests that the patient's subdurals may have developed after the initial CT scan." (Id.)

In addition, petitioner points to nine physician entries – dated July 3, 16, 17, 19, 27, 29, 30, and 31 and August 1, 1996 – which, according to petitioner, appear to describe Badalucco as conscious. The first entry, dated July 3, 1996, appears to be signed by a Dr. Akram Abdoue and states, inter alia, that the patient "is awake, looking around and repeatedly coughing." (See Resp't Ex. B. at 227.) The second entry, dated July 16, 1996, appears to be by a neurologist and states, inter

_____

[2]  As the trial record makes clear, defense counsel did not receive a copy of the DNR until after his cross-examination of Dr. Gutierrez, due to the state's inadvertent failure to include it in the medical records that were given to the defendant. (Tr. at 326.)

alia, "patient is awake . . . .Would consider akinetic mutism[3] instead of chronic vegetative state. Could

be [due] to head trauma (may or may not be due to HIV)." (Id. at 144.) It appears from the records

that Dr. Salgado was involved in that consultation. (Hearing Tr. at 29-33.) The third entry, dated July

17, 1996, appears to be signed by Dr. Zahedi and another person[4] and states, inter alia, "? Alert,

Awake" and "? responsive to vocal commands sometimes." (See Resp't Ex. B. at 149.) The fourth

entry, dated July 19, 1996, also appears to be signed by Dr. Zahedi and another person and states,

inter alia, "? Alert, Aware" and "? responsive to vocal commands." (See id. at 154.) The fifth entry,

dated July 27, 1996, also appears to be signed by Dr. Zahedi and another person and states, inter alia,

"Alert, Awake, responsive to vocal commands sometimes, responsive to painful stimuli." (Id. at 180.)

All of the latter three entries also make references to "coma" and "head trauma." (See id. at 149, 154,

180.) The sixth entry, dated July 29, 1996 and apparently signed by Dr. Zahedi and another doctor

states, inter alia, "A.A. ? Orientation, not in distress." (Id. at 185.) The seventh entry, dated July 30,

1996 and also signed by Dr. Zahedi and another person, states, inter alia, "A, A, ? Orientation." (Id. at

188.) The eighth entry, dated July 31, 1996 and signed by Dr. Zahedi and another person, states, inter

---

[3]  According to one source, akinetic mutism is "[a] state in which a person is unspeaking (mute) and unmoving (akinetic). . . . [A] person with akinetic mutism has sleep-waking cycles but, when apparently awake, with eyes open, lies mute, immobile and unresponsive. Akinetic mutism is often due to damage to the frontal lobes of the brain. (http://www.medterms.com/ script/main/art.asp?articlekey=6990) (internal quotations and citations omitted) (last checked June 2, 2005.)

[4]  Although the other signature is illegible, according to Dr. Zahedi's affidavit submitted in opposition to petitioner's C.P.L. § 440.10 motion, the signature is that of Dr. Bhuiyan, a resident whom Dr. Zahedi was supervising. (Affidavit of Tooraj Zahedi, M.D., sworn to Feb. 28, 2003, ¶ 8.) Dr. Zahedi explained that the question marks on some of the records indicate that Dr. Bhuiyan "was unsure of Mr. Badalucco's level of responsiveness." (Id.)

alia, "A, A, ? Orientation. On ventilator. Not in distress." (Id. at 191.) The ninth entry, dated August 1, 1996 and signed by Dr. Zahedi and another person, states, inter alia, "A, A, ? Orientation." (Id. at 195.) At the hearing before this court, Mr. Stutman conceded that he did not cross-examine Dr. Salgado about these entries in the hospital records or reference them in his summation. (Hearing Tr. at 38, 43.) According to petitioner, these entries undermine the prosecution's claim that Badalucco was comatose.

The trial record makes clear that petitioner's counsel had a two-pronged trial strategy. First, counsel aggressively cross-examined the cooperating witness, Vernon Foye, and the only other witness to the assault, Natalia Rapaport, in an effort to convince the jury that neither witness was credible and that Foye was the primary aggressor. (Tr. at 232-38, 243-45, 252-53.) Counsel elicited from both Foye and Officer Rivera that Foye's bloody watch was found in the elevator after the assault, information counsel used in summation to argue that Foye had to have beaten Badalucco violently for his watch to have come off. (Tr. at 105-07, 243-45, 441, 449-50.) Counsel also argued repeatedly that Foye was "getting a good deal," was motivated to "say whatever the District Attorney would want him to say" and was "walking out the door" and "going home to sleep in his own bed" instead of being tried for murder. (Tr. at 21, 235, 441, 449.) In addition, he obtained an admission from Foye that he had had four alcoholic drinks on the afternoon of June 15, 1996 (id. at 221-23) and an admission from Rapaport that she was intoxicated at the time of the incident and that she had not noticed Badalucco in the elevator during the ascent. (Id. at 41, 45, 48, 50.) Foye also admitted on cross-examination that, when he encountered the Starrett City peace officers in the lobby, he was heading for the front door with the intention of exiting the building. (Id. at 240.) He conceded that he

only spoke with the officers after Little approached him and after his friend, Andre Eugene, prompted him to tell the officers what he knew.  (Id. at 243.)

Second, counsel introduced Badalucco's hospital records into evidence and used them to cross-examine the medical witnesses regarding Badalucco's condition and cause of death.  (Id. at 349-51.)  He elicited from both Drs. Salgado and Gutierrez that the words "awake and alert" would indicate that the patient was conscious.  (Id. at 307, 342.)  He then read two nursing reports, dated July 13, 1996 and July 9, 1996, in which Badalucco was described as awake and responsive to tactile and verbal stimuli.  (Id. at 349-51.)  During his cross-examination of Dr. Gutierrez, he obtained an admission that, had there been some medical intervention at the time of Badalucco's death, it is "possible that he would not [have died] at that moment."  (Id. at 314-15.)  In addition, Dr. Gutierrez explained on cross-examination that, at some point, Badalucco "extubated himself; meaning the patient removed the [ventilator] tube," and the hospital staff declined to replace it, but instead applied an oxygen mask.  (Id. at 321, 323.)

During summation, in addition to attacking the credibility of Rapaport and Foye, counsel focused on the issue of causation, reminding the jury of the DNR and stating that "from a legal point of view, it is something you have to consider.  There are different causes of death than blunt impact injury."  (Id. at 452.)  Counsel also noted on summation that Badalucco had pneumonia, a common complication of AIDS, and argued that he should have been aspirated and on a ventilator. Counsel argued that Badulucco might have lived longer, "[b]ut the doctors followed the family's wishes; as a result, Peter was allowed to slip away comfortably." (Id. at 453.)

Trial counsel also argued successfully, against the prosecutor's objection, for a specific

charge on causation.  (Id. at 407-23.)  As a result, the court instructed the jury that:

> [I]n order to prove the defendant guilty of either murder in the second
> degree or manslaughter in the first or second degrees, the People are
> required to establish beyond a reasonable doubt that the defendant's
> conduct in striking and kicking Peter Badalucco was the competent
> producing cause of death.  The defense contends that the People have
> failed to prove that Peter Badalucco died as a result of the defendant's
> conduct.  The defense also contends that the evidence establishes
> instead that Peter Badalucco died solely as a result of untreated
> pneumonia, HIV encephalitis at the hospital, or at the very least that a
> reasonable doubt exists whether it was the defendant's conduct or the
> untreated pneumonia and HIV encephalitis which caused Peter
> Badalucco's death.
>
> A defendant charged with either murder or manslaughter cannot escape
> liability merely because the wound he inflicted did not cause immediate
> death.  It is sufficient if the wound inflicted, that is, blunt impact head
> trauma, causing the diffuse axonal injury and subdural hematoma, was
> the legal cause of death; that is, if it started a chain of causation which
> was the competent producing cause of death.  If, however, the death
> was caused not by the blunt impact head trauma, but by an independent
> supervening cause, in this case the untreated pneumonia and HIV
> encephalitis, then the defendants' conduct would not be the competent
> producing cause of death.

(Id. at 531-32.)[5]

_____

[5]  Defense counsel also successfully moved for a charge on intoxication.  As a result, the court
instructed the jury:

> You also recall that evidence was presented that at the time the crimes
> were allegedly committed, the defendant, Thomas Currao, was
> intoxicated. . . . The defendant contends that by reason of his state of
> intoxication on June 15, 1996, he was incapable of forming the specific
> intent required to commit the crimes of murder in the second degree, . .
> . manslaughter in the first degree and assault in the second degree.
>
> * * *
>
> Intoxication is not as such a defense to a criminal charge.  But in any

(continued...)

Petitioner argues that the medical evidence is open to interpretation and that an expert could have assisted counsel in challenging the government's theory of a causal link between the assault and Badalucco's death. (Transcript of Oral Argument, dated Jan. 6, 2005, at 35.) It is true that the medical records are voluminous and, in some instances, difficult for a lay person to understand.[6] However, much is clear. The records very plainly show a patient who entered the hospital with a head injury after a violent assault and steadily declined until his death almost eight weeks later.

Moreover, the testimony of the treating physicians and the family members, as well as

[5](...continued)

> prosecution for an offense, evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged. This means that intoxication, in and of itself, is neither a defense nor an excuse for the commission of a crime. It does not make the act or acts less criminal. However, if you find that the defendant was intoxicated at the time of the crime, you may take this fact in to consideration in determining if he was in such a state of intoxication as to be incapable of having the required specific intent for the commission of the crimes of murder in the second degree, . . . manslaughter in the first degree and assault in the second degree.
>
> &ast; &ast; &ast;
>
> The law recognizes that a defendant may be intoxicated, yet at the same time be capable of forming an intent to commit a crime. It is only where a defendant's intoxication is of such a degree, character and extent as to deprive him of the power of forming particular criminal cintent that he may be relieved of criminal responsibility for his conduct. . . .

(Tr. at 532-35.)

[6] Mr. Stutman conceded that he has no medical education or training, and that he did not believe he interviewed any of the doctors or nurses who treated Badalucco. (Transcript of Hearing, dated Apr. 27, 2005, at 15-16.) Although his memory of this case has faded with time and he had no specific recollection of what sources he consulted, Mr. Stutman asserted that it would have been his practice to educate himself and that he would have "certainly understood" all of the medical terms "in relation to the facts of this case." (Id. at 120-21.)

the hospital records taken as a whole, belie the claim that Badalucco's condition ever improved after the beating or that his injury was not grave. According to the records, Badalucco, who was 6'2" tall, weighed 130 pounds upon his admission; when he died almost eight weeks later he weighed 92 pounds. (Resp't Ex. B at 52; Tr. at 300.) Indeed, the hospital records are replete with references to Badalucco as being comatose or unconscious following blunt head trauma, non-responsive to verbal stimuli but responsive to painful tactile stimuli, in need of "complete assistance" and a feeding tube, and in a "guarded" or "grave" condition. (See generally Resp't Ex. B.) In addition, the DNR states explicitly that, as of July 15, 1996, Badalucco lacked the capacity "to understand and appreciate the nature and consequences" of the DNR, that his condition was "terminal," and that resuscitation "would be medically futile." (See id. at 2-4.)

Respondent argues that the occasional "awake and alert" notations could easily have been explained and discounted as errors by secondary care providers or as reflecting a "misunderstanding of Badalucco's roving eye movements and wakeful moments as indicating a level of cognitive function that was not there." (Resp't Mem. at 10.) However, even if defense counsel could have demonstrated conclusively that Badalucco had moments of consciousness or wakefulness in the hospital, that showing would not likely have cast reasonable doubt on the cause of death, given the overwhelming medical proof that Badalucco suffered a severe head injury from which he did not recover. Sporadic references to Badalucco as "awake" or "alert" or not permanently unconscious do little, if anything, to controvert the solid evidence of blunt head trauma and consistent deterioration that the records as a whole describe.

Furthermore, counsel clearly made a strategic decision to tread lightly on the causation issue in

order to avoid alienating the jury by appearing to blame a sympathetic victim or his family for the death.

(See Tr. at 429; see also id. at 452 ("You can imagine the suffering that this family went through.  But at the same time from a legal point of view we have to examine what happened.").)  In addition, Mr. Stutman testified at the hearing before this court that he found many entries in the medical records damaging to the defense, including repeated descriptions of Badalucco as being in a coma and unresponsive to verbal stimuli.  (Transcript of Hearing, dated Apr. 27, 2005 ("Hearing Tr."), at 93.)

He described the medical testimony as "quite devastating"[7] and said he decided, rather than consulting a medical expert and emphasizing the medical evidence, to "aggressively attack certain witnesses" and focus on "other facts of the case, how the incident occurred, so on and so forth."  (Id. at 117, 119.)

He testified that he made a deliberate decision not to put a doctor on the stand because he "didn't want to bring out and highlight and have the jury going back over those medical records."  (Id. at 118.)[8]

Nevertheless, counsel did repeatedly remind the jury that Badalucco had AIDS, that he was an illegal drug user, that he developed pneumonia, a common complication of AIDS, and that his family had signed a DNR which, according to defense counsel, likely "hasten[ed] his death." (Tr. at 22-24.)  He also argued that the hospital had failed to take measures to keep Badalucco alive.  See id. at 452-53 ("You heard the testimony about the Do Not [R]esuscitate.  You heard the testimony from Dr.

---

[7] As respondent points out, counsel also knew that Dr. Jonathan Arden, the Chief Medical Examiner of the City of New York, had testified in the grand jury that Badalucco never regained consciousness during his hospitalization and died of diffuse axonal injury caused by blunt head trauma, a conclusion he drew from Badalucco's medical records.  (Hearing Tr. at 54-56, 83.)

[8] In light of Mr. Stutman's testimony, the court need not consider Ms. Dille's description of her post-trial conversations with him.  Mr. Stutman stated under oath that he did not consult a medical expert.

Gutierrez, from Dr. Salgado, that at the time that Peter passed, had the doctors been allowed to do their job, perhaps he wouldn't have passed on at that time. Perhaps he would have passed on later, perhaps not at all. . . . At the time Peter had died he had developed pneumonia. They should try to aspirate him, try to put him on a ventilator, the doctor wouldn't say for sure that perhaps he might have lived longer."). Viewed in the larger context of all the evidence adduced at trial, including the compelling testimony of Badalucco's family members and treating physicians, petitioner cannot demonstrate that counsel's strategic decision not to consult or call a medical expert prejudiced the defense in this case.

Dr. Fisher's affidavit is refutable. As respondent explains, New York law on causation required the State to prove: (1) "that the defendant's conduct was an actual cause of death, in the sense that it forged a link in the chain of causes that brought about the death;" and (2) that "'the defendant's actions w[ere] *a sufficiently direct cause* of the ensuing death.'" <u>People v. Stewart</u>, 40 N.Y.2d 692, 697 (1976) (emphasis in original) (quoting <u>People v. Kibbe</u>, 35 N.Y.2d 407, 413 (1974)). A "sufficiently direct cause" does not require that the victim's death immediately follow the injury; nor is it a defense to a murder charge that other injuries or a pre-existing medical condition contributed to the victim's death. <u>Stewart</u>, 40 N.Y.2d. at 697; <u>People v. Cicchetti</u>, 44 N.Y.2d 803, 804-05 (1978). Thus, even if erroneous medical procedures contributed to the death, a defendant's conduct can still be the legal cause of death. <u>Stewart</u>, 40 N.Y.2d at 697 ("if 'felonious assault is operative as a cause of death, the causal co-operation of erroneous surgical or medical treatment does not relieve the assailant from liability for homicide'") (quoting <u>People v Kane</u>, 213 NY 260, 270 (1915)). Only if the victim's death is solely attributable to erroneous medical procedures or other causes and is not at all induced by

the defendant's conduct will the intervening medical care or co-existing medical condition be a defense to a homicide charge.  Stewart, 40 N.Y.2d at 697.  See also Santana v. Kuhlmann, 232 F. Supp. 2d 154, 167-68 (S.D.N.Y. 2001).  Moreover, the withdrawal or refusal of life sustaining treatment does not relieve a defendant of responsibility for the victim's death.  See People v. Velez, 159 Misc.2d 38, 43 (Sup. Ct. Bronx County 1993); see also People v. Vaughn, 152 Misc.2d 731, 741-43 (Sup. Ct. Erie County 1991) ("a competent crime victim, or an agent acting on behalf of an incompetent crime victim, cannot only decline extraordinary medical measures but can also affirmatively request and obtain the removal of artificial life supports . . . . [Such acts cannot] provide escape to the initial perpetrator whose vicious act propelled the victim to certain and extended death and which act, at the time of the victim's release from artificial life supports, continued to be a substantial contribution to that death.").  In short, the People were not required to prove that the assault was the sole cause of Badalucco's death, only that it contributed to his death.

Dr. Fisher never examined Badalucco, did not interview any of the trial witnesses, and was not present at the autopsy.  Moreover, as a pathologist, Dr. Fisher is not involved in the day-to-day care of patients and is in less of a position than Badalucco's treating doctors to render an opinion about his condition.  He also apparently was not given the testimony of  Badalucco's uncle, who described Badalucco as sufficiently functional to ride a motorcycle and have a normal conversation immediately prior to the assault, but said he never saw Badalucco speak or sit up during any of his daily visits to the hospital.  Nor was Dr. Fisher provided with the trial testimony of the eyewitnesses to the assault and its aftermath.  Thus, his conclusion that Badalucco's death was wholly unrelated to the assault would have been challenged vigorously had he been called to testify at trial.

Indeed, had Dr. Fisher been called to testify on petitioner's behalf at trial, his testimony would have provoked a rebuttal similar to that made in response to petitioner's C.P.L. § 440.10 motion. In opposition to that motion, the state submitted affidavits from Dr. Zahedi and Dr. Gutierrez. Dr. Zahedi, the internist who was in charge of Badalucco's care while he was hospitalized, stated that he had reviewed the medical records, the testimony of Drs. Gutierrez and Salgado, the grand jury testimony of Chief Medical Examiner Jonathan Arden, the autopsy report, and Dr. Fisher's affidavit. (Affidavit of Tooraj Zahedi, M.D., sworn to Feb. 28, 2003, ¶ 3, Petitioner's Appendix at 142-49.) Based on his review of the medical records as well as his own recollection, he described Badalucco's condition and explained that some of his symptoms, including spasticity of the limbs and a strong bilateral plantar response, were indicative of decerebrate rigidity, "a type of spastic muscular condition seen when a patient has suffered severe cortical damage." (Id. ¶ 5.) Dr. Zahedi noted that Badalucco's initial CT scan showed bilateral subdural hygromas, which had increased by the time of Dr. Salgado's neurological consult three days later. (Id.) He further stated that Badalucco was at all times in a coma, which varied in level, and he expressed the opinion that – although CAT scans showed some mild diffuse cerebral atrophy consistent with AIDS -- there could be no doubt that Badalucco died as a result of head trauma. (Id. ¶¶ 6, 8, 14.) He explained that an AIDS patient who has suffered cortical atrophy is "particularly susceptible to severe consequences resulting from blunt head trauma" because a blow to the head would cause the person's brain to move more freely inside the skull. (Id. ¶¶ 6, 7.) Contrary to Dr. Fisher's suggestion, he noted that "one does not necessarily expect to see depressed skull fractures in cases of severe blunt head trauma." (Id. ¶ 7.) Dr. Zahedi also found no merit to Dr. Fisher's claim that Badalucco was "unquestionably conscious" at various times during his

hospitalization; he explained that "[r]estless agitation is often seen in comatose patients and it does not

indicate any level of consciousness." (Id. ¶¶ 8, 10.)  He also explained that nurses' notes can contain

inaccuracies. (Id. ¶ 9.)  In addition, he described the hospital staff's efforts to suction Badalucco to

remove accumulated fluid from his lungs and stated that, contrary to Dr. Fisher's assertion, "there was

no time during Mr. Badalucco's hospitalization when the suctioning of his lungs to clear accumulated

fluids was suspended or supportive care withheld." (Id. ¶¶ 12, 13.)  Dr. Zahedi concluded:

> Mr. Badalucco became comatose because of the head trauma he had
> suffered. . . . Dr. Fisher's implicit claim that Mr. Badalucco
> coincidentally became comatose as a result of his AIDS on the day he
> was beaten by the defendant is plainly absurd, and his explicit claim that
> Mr. Badalucco would have lived if he had been reintubated . . . is
> similarly nonsensical.  The neurological report prepared by Dr. Salgado
> just three days after Mr. Badalucco suffered the head trauma showed
> that Mr. Badalucco's cortical function was essentially gone.  Mr.
> Badalucco had no hope of making a functional recovery from that
> assault.

(Id. ¶ 14.)

Likewise, Dr. Gutierrez confirmed his trial testimony that "[t]he ultimate cause of Mr.

Badalucco's death was the head trauma he sustained, which set in motion the events that finally led to

his death." (Affidavit of Joaquin Gutierrez, M.D., sworn to Mar. 5, 2003, ¶ 6.) Based on his review of

the autopsy report, he found "no validity to Dr. Fisher's assertion . . . that the type of brainstem damage

seen in Mr. Badalucco could have been caused by AIDS." (Id. ¶ 5.)  He concluded that "[a]s a result

of being unconscious, Mr. Badalucco developed bronchopneumonia, which was the immediate cause

of death." (Id. ¶ 6.)

As respondent points out, courts deciding ineffective assistance claims should not

engage in "Monday-morning quarterback[ing]" over trial strategy.  Medina v. McGinnis, No. 04 Civ. 2515, 2004 WL 2088578, at *26 (S.D.N.Y. Sept. 20, 2004).  When assessing counsel's performance, a court "must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (quoting Strickland, 466 U.S. at 690).  The reviewing court must afford a "'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  United States v. Jones, 918 F.2d 9, 12 (2d Cir. 1990) (quoting Strickland, 466 U.S. at 689).  And as explained, even if counsel's performance was objectively unreasonable, the claim must fail unless the petitioner proves prejudice.  Strickland, 466 U.S. at 687.

Employing this standard, Currao cannot establish that his trial counsel – who secured acquittals on the two second-degree murder charges –  provided constitutionally ineffective assistance. Indeed, at sentencing the trial judge made a point of praising defense counsel's performance, stating to Currao, "you had an excellent defense by an excellent defense counsel."  (Transcript of Sentencing, dated Sept. 15, 1998, at 16.)  In short, this court is not prepared to hold that any errors counsel made were "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  Strickland, 466 U.S. at 687.

To be sure, in some circumstances, it is objectively unreasonable for counsel to fail to conduct an adequate pre-trial investigation.  For example, in Pavel v. Hollins, 261 F.3d 210 (2d Cir. 2001), the Second Circuit found trial counsel ineffective for, *inter alia*, failing to consult or call a medical expert to challenge the state's allegation that the petitioner had sexually abused his children. Trial counsel in that case conceded that he prepared no defense whatsoever "because [he] felt that the

medical evidence was insufficient to sustain a conviction [and] believ[ed] instead that a motion to dismiss the State's case at the close of its evidence in chief would be granted by the Court." Id. at 211-12. Because counsel did not conduct a sufficient investigation and his failure to call a medical expert was not based on "appropriate strategic considerations" in a case that was essentially a "credibility contest," the court found that counsel's representation "did not fall within the Sixth Amendment's 'wide range' of adequate assistance." Id. at 225 (quoting Strickland, 466 U.S. at 690). Such is not the case here. Unlike the defense attorney in Pavel, Mr. Stutman did prepare and present a vigorous defense to the charges and did have appropriate strategic reasons for deciding not to call a medical expert in this case.

Moreover, petitioner has not satisfied the second prong of the Strickland test; that is, he has failed to demonstrate that he suffered prejudice as a result of counsel's actions. See Loliscio v. Goord, 263 F.3d 178, 195-96 (2d Cir. 2001) (although trial strategy was "incoherent" and therefore "objectively unreasonable," petitioner was not prejudiced by counsel's performance). Under Strickland, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland 466 U.S. at 694. Petitioner has failed to show that the outcome of his trial would likely have been different had his counsel consulted a medical expert or placed more emphasis on the causation defense.

## CONCLUSION

For the reasons stated above, I respectfully recommend that the petition for a writ of habeas corpus be denied.  Objections to this report and recommendation must be filed within ten (10) days, with a courtesy copies to Judge Amon and to my chambers, in order to preserve appellate review.  <u>See</u> 28 U.S.C. § 636(b)(1).

Respectfully submitted,

_____/s/_____
ROBERT M. LEVY
United States Magistrate Judge

DATED:  Brooklyn, New York
         July 6, 2005